UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>Renee King</u>,
    Plaintiff

    v.                                  Case No. 24-cv-018-SM
                                        Opinion No. 2025 DNH 148

<u>DMO Auto Acquisitions LLC</u>
<u>d/b/a Dan O'Brien Kia</u>,
    Defendant

## **O R D E R**

Renee King brings this action against her former employer, DMO Auto Acquisitions LLC ("DMO"), claiming that she was the victim of unlawful age discrimination, in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.  Specifically, King alleges that DMO subjected her to several adverse employment actions as a result of her age (Count One) and then, when she reported to management that she believed she was being discriminated against based on her age, DMO retaliated against her (Count Two).

DMO moves for partial summary judgment on a limited aspect of King's claims: that one of the several adverse employment actions DMO took against King was her eventual constructive discharge.  DMO says that, as a matter of law, there is

insufficient evidence to support King's assertion that she was constructively discharged.

For the reasons discussed, defendant's motion for partial summary judgment is denied.

**Standard of Review**

When ruling on a motion for summary judgment, the court is "obliged to review the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor."  Block Island Fishing, Inc. v. Rogers, 844 F.3d 358, 360 (1st Cir. 2016) (citation omitted).  Summary judgment is appropriate when the record reveals that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, a factual dispute "is 'genuine' if the evidence of record permits a rational factfinder to resolve it in favor of either party, and 'material' if its existence or nonexistence has the potential to change the outcome of the suit."  Rando v. Leonard, 826 F.3d 553, 556 (1st Cir. 2016) (citation omitted).  When material facts are genuinely disputed, such a dispute must be resolved by a trier of fact, not by the court on summary judgment.  See, e.g., Kelley v. LaForce, 288 F.3d 1, 9 (1st Cir. 2002).

**Factual Background**

Construing the record in the light most favorable to Ms. King - as the court must at this juncture - a brief statement of the relevant facts is as follows.  King's employment at DMO spanned approximately seven months.  It began in December of 2018, when she was hired as a "Finance Biller," and ended with her resignation in June of 2019.  At the time, she was 50 years old.  As a Finance Biller, King's weekly base salary was $600.  Importantly, however, that position also provided her with the opportunity to earn potentially sizable monthly commissions.  See Deposition of Renee King (document no. 25-2) at 106.  See also Complaint at para. 22 ("Finance Manager Heath reportedly earned $1,935.00 in commissions in January of 2019.").

According to King, the workplace at DMO - at least in the finance department - was rife with age discrimination.  In particular, Andrew Goumillout (the newly-appointed, 23-year old "Finance Director"), and Jordan Heath (the 27-year old "Finance Manager") made it unmistakably clear that they did not want to work with "old people" like King.  The two spoke about how they had recently succeeded in getting another older worker fired, and frequently talked about how they would eventually get King fired.  See, e.g., Affidavit of Renee King (document no. 1-1) at paras. 15-16, 24.

As a Finance Biller, King needed to understand and properly use software known as "DealerTrack." Goumillout and Heath were assigned the task of training her on that software. According to DMO's Human Resource Manager, Kerri Goodell, "the training process for the Finance Department takes several weeks to a month due to the complexity of the process and the numerous details to adhere to state and federal compliance." Complaint at para. 8 (quoting Goodell's testimony before the New Hampshire Commission for Human Rights). Yet, Goumillout and Heath refused to provide King with any training on the DealerTrack software, saying things like, "old people shouldn't use computers and do this kind of work," and "old people don't belong on computers," and "You're older. You don't belong here and we don't like old people in this department." Deposition of Renee King at 51-82. See also Deposition of Haley Hannaford (another Finance Biller at the time) (document no. 25-9) ("I do remember her [Jordan Heath] always being like, "Don't waste your time. There's no point [trying to train King on the software] because she's too old to understand computers."). Indeed, says King, Goumillout and Heath even refused to provide her with basic information like log-in credentials to the computer system or instructions on how to clock in at the start of each workday (it seems that either Goumillout or Heath clocked King in and out each day,

4

saying they would show her how to do so some other time). See Affidavit of Renee King at paras. 9-10 and 17.

King also says that Heath and Goumillout isolated her from other employees in the finance department, refused to let her eat lunch with that group, actively prevented another finance department employee (Haley Hannaford) from training her on the DealerTrack software, assigned her menial tasks to perform, and forced her to park in a remote parking area, while the other members of the finance department parked directly in front of the building. Deposition of Renee King at 85-88. See also King Affidavit at para. 12.

King informed Human Resources Manager Kerri Goodell that she lacked log-in credentials and was not receiving necessary training from either Goumillout or Heath. She also explained that Goumillout and Heath "refused to train [her] because they don't like working with old people." King Affidavit at para. 17. Goodell reminded Goumillout that, as the Finance Director, he was responsible for ensuring that King was properly trained on the company's software. Nevertheless, Goumillout (and Heath) still refused to provide King with the necessary training. As a consequence, it took King far longer than expected to learn even the basics of using the DealerTrack software and she was unable

5

to perform many of the essential computer-based tasks expected of a Finance Biller.

Based upon reports that King was not adequately performing her job in the finance department, Joseph Donahue transferred her to the role of receptionist/cashier. Those reports of King's deficient performance came from the very people who were charged with training King, but steadfastly refused to do so, <u>and</u> who reportedly spoke of trying to get King fired because of her age: Goumillout and Heath. <u>See</u> Deposition of Joseph Donahue (document no. 25-4) at 21-23, and 28. <u>See generally</u> <u>Brandt v. Fitzpatrick</u>, 957 F.3d 67, 79 (1st Cir. 2020) (noting that an employer can be held liable when a decision-making official - like Joseph Donahue - "relies on false information that is manipulated by another employee who harbors illegitimate animus to take an adverse employment action.") (citations and internal punctuation omitted).

Following those reports from Heath and Goumillout, King was transferred without correction, reprimand, or any effort to determine whether she had received necessary training for the job of Finance Biller. King points out that upon her transfer to her new role as cashier, Human Resources Manager Kerri Goodell told her that she would "actually be trained" in how to

6

perform this job - a statement King suggests is an implicit acknowledgment that she was not properly trained to be a Finance Biller.  King Deposition at 91-92.  As DMO's receptionist/cashier, King's salary was reduced by nearly 20 percent and, perhaps more importantly, she lost the opportunity to earn any commissions.  King worked as DMO's cashier for four months, but eventually concluded that she could "no longer afford to work with such little pay."  Id. at 95.  Accordingly, she resigned.  But, says King, that resignation was forced upon her by DMO's wrongful conduct and amounts to a constructive discharge.

## Legal Background

Under the ADEA, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C.A. § 623(a)(1) (emphasis supplied).  Generally speaking, to prevail on an age discrimination claim under the ADEA in circumstances like those presented here, the plaintiff must demonstrate that: (1) she was a member of the "protected class" - that is, 40 years of age or older; (2) she was qualified for the job at issue; (3) the employer subjected her to an "adverse employment action;" and (4) the plaintiff's age was the determining or "but for" factor in prompting the adverse employment action.  See, e.g., Reeves

7

v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000); Velez v. Thermo King de Puerto Rico, Inc., 585 F.3d 441, 447 (2009).  See generally Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (defining an "adverse employment action").

## Discussion

King alleges that she was 50-years old during the time of her employment with DMO and fully qualified to perform the job of Finance Biller.  She also alleges that DMO adversely affected the terms and conditions of her employment because of her age. As evidence that DMO subjected her to adverse employment actions, King points to the following conduct on DMO's part:

(a) depriving her of necessary training and thereby preventing her from performing her job duties and impairing her earning capacity;

(b) subjecting her to several forms of unfavorable treatment in the workplace (e.g., refusal to train; exclusion from lunch; assignment to perform menial tasks; remote parking; repeated discriminatory comments about her age);

(c) demoting her and reducing her pay; and

(d) constructively discharging her.

See, e.g., Complaint (document no. 1) at para. 34.

Thus, King's allegation that she was constructively discharged is only one element of the proof she advances in support of her overall claim that DMO unlawfully discriminated against her and subjected her to various "adverse employment actions" based upon her age.  King does not advance a separate claim of "wrongful termination" (an essential element of which would be her alleged constructive discharge).  Nevertheless, DMO says there is insufficient evidence in the record to support King's constructive discharge claim and, therefore, it asserts that it is entitled to "partial summary judgment" on that issue.  The court disagrees.[1]

Whether an employee has been constructively discharged is a question of fact.  The Court of Appeals for this circuit has explained the "basic rules governing constructive discharge" as follows:

> The trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.  This is an objective standard, in which the focus is upon the reasonable state of mind of the putative discriminatee.

---

[1] Whether DMO's motion for summary judgment is more properly viewed as a motion in limine to exclude certain evidence is of no practical import.  Viewed through either lens, the outcome at this juncture is the same.

Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 561 (1st Cir. 1986) (citations omitted). Critically, as least for purposes of this case, "salary considerations are important in determining whether a job transfer can support a claim of constructive dismissal." Serrano-Cruz v. DFI Puerto Rico, Inc., 109 F.3d 23, 26 (1st Cir. 1997). See also Goss v. Exxon Office Systems Co., 747 F.2d 885, 888-89 (3d Cir. 1984); Williams v. Caterpillar Tractor Co., 770 F.2d 47, 51 (6th Cir. 1985) (Krupansky, J., concurring). See generally Blackie v. State of Me., 75 F.3d 716, 725 (1st Cir. 1996) (noting that reducing an employee's salary can constitute an "adverse employment action").

More recently, the Court of Appeals explained that to prove a constructive discharge claim:

> an employee must prove that his employer imposed working conditions so intolerable that a reasonable person would feel compelled to forsake his job rather than to submit to looming indignities. Accordingly, an employee must show some sort of adverse employment action short of actual termination - such as one might also see in a retaliation or discrimination case - to make out a claim of constructive discharge.
>
> Typically, the employer must either (1) take something of consequence from the employee, say, by discharging or demoting him, reducing his salary, or divesting him of significant responsibilities, or (2) withhold from the employee an accouterment of the employment relationship, say, by failing to follow a customary practice of considering him for promotion after a particular period of service.

10

Reyes v. Garland, 26 F.4th 516, 521–22 (1st Cir. 2022) (emphasis supplied; citations and internal punctuation omitted).

Here, all agree that the receptionist/cashier position to which DMO transferred King provided her with a substantially reduced salary and no opportunity to earn commissions. And, King testified that she felt forced to resign from that position because her weekly income was simply too low.

> Q.   Okay. When you first interviewed at Dan O'Brien Kia, I believe you said you were making $18 an hour in the job you had at the time; is that right?
>
> A.   That is correct.
>
> Q.   And who was your employer again?
>
> A.   Granite State Management & Resources.
>
> Q.   Did your decision to accept employment with Dan O'Brien Kia have anything to do with the possibility of earning a greater sum of money or not?
>
> A.   Oh, 100 percent, yes.
>
> Q.   Yes what?
>
> A.   Well, when I went to my interview for Dan O'Brien Kia and I met Andrew [Goumillout] and I was told that he made $14,000 that month, and that's what I wanted to make. And that's what they said, they said - I forget which one said it, I think Charles said - "Teach her everything that you know." So I had very high hopes going into that position where I was going to get trained on what Andrew knew and make that kind of money.

11

Q. Okay.

A. That would be a game changer for me.

Q. Okay. All right. And when you transitioned to the cashier position, is it or is it not true that you were making 12.50 an hour in that position?

A. That's correct.

Q. And how many hours a week were you working?

A. I was doing 40.

Q. So you were grossing $500 a week in the cashier position, is that right?

A. Correct.

Q. Would you have left your employment with Granite State if you had known that you would ultimately be making $500 a week for Dan O'Brien?

A. No.

Q. Okay. And can you say whether or not the fact that you're earning $500 a week at Dan O'Brien Kia had anything to do with your decision to transition to other employment?

A. It had everything to do with that. 100 percent. I had to get a different job earning more money.

Deposition of Renee King at 106-07. <u>See also</u> <u>Id</u>. at 95 (Q. Do you remember saying in this statement that you had to resign because you could no longer afford to work with such little pay? A. Yes, that's the truth.").

Given the state of the evidence before the court, DMO has failed to demonstrate that it is entitled to judgment as a

12

matter of law on the limited question of whether King was constructively discharged. Crediting King's testimony as true, the trier of fact could reasonably and plausibly conclude that when she was transferred to the cashier position - allegedly as a result of age discrimination - King's substantially reduced salary and her inability to earn commissions rendered her job so difficult or unpleasant that a reasonable person in her shoes would have felt compelled to resign. See generally Nashawaty v. Winnipesaukee Flagship Corp., No. 15-CV-118-JD, 2016 WL 4257335, at *3-4 (D.N.H. Aug. 11, 2016) (finding sufficient evidence to allow the jury to conclude that plaintiff was subjected to constructive discharge).

## Conclusion

For the forgoing reasons, as well as those set forth in plaintiff's legal memoranda (documents no. 25-1 and 27), defendant's Motion for Partial Summary Judgment on the Constructive Discharge Portion of Count I of Plaintiff's Claims (**document no. 23**) is denied, albeit without prejudice to DMO's ability to revisit the issue in the context of trial and based upon a more complete evidentiary record.

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

December 22, 2025

cc: Counsel of Record

14